Opinion for the court filed by Circuit Judge BRYSON.
Dissenting opinion filed by Circuit Judge NEWMAN.
BRYSON, Circuit Judge.
Bayer Schering Pharma AG and Bayer Healthcare Pharmaceuticals, Inc., (collectively, “Bayer”) appeal from two judgments of the United States District Court for the Southern District of New York. In the first case, the court dismissed Bayer’s patent infringement claims against Watson Pharmaceuticals, Inc., and Watson Laboratories, Inc., (collectively, ‘Watson”) and Sandoz, Inc. In the second case, the court dismissed similar patent infringement claims against Lupin Ltd. and Lupin Pharmaceuticals, Inc., (collectively, “Lupin”). We affirm.
I
The Drug Price Competition and Patent Term Restoration Act of 1984 (“the Hatch-Waxman Act”), Pub. L. No. 98-417, 98 Stat. 1585, creates a procedure by which a drug manufacturer can obtain permission from the Food and Drug Adminis *1318 tration (“FDA”) to market a generic version of a previously approved drug. A manufacturer seeking to market a generic drug is entitled to submit an Abbreviated New Drug Application (“ANDA”), rather than submitting a full New Drug Application (“NDA”). Eli Lilly & Co. v. Teva Pharm. USA, Inc., 557 F.3d 1346, 1348 (Fed.Cir.2009). The ANDA process streamlines FDA approval by allowing the generic manufacturer to rely on the safety and efficacy studies of a drug that has previously been approved upon a showing that the generic version and the relevant listed drug share the same active ingredients and are bioequivalent. Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc., 527 F.3d 1278,1282 (Fed.Cir.2008).
In the case of drugs that enjoy patent protection, the Hatch-Waxman Act creates a mechanism that allows for prompt judicial determination of whether the ANDA applicant’s drug or method of using the drug infringes a valid patent. The Act makes it an act of infringement to file an ANDA for a drug or for a use of the drug that is claimed in a patent. 35 U.S.C. § 271(e)(2)(A). That “artificial” act of infringement creates jurisdiction for a court to entertain an action by the patentee against the ANDA applicant in which issues of patent infringement and validity can be resolved. Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1365 (Fed.Cir.2003).
The Hatch-Waxman Act requires an NDA applicant seeking FDA approval for a drug that enjoys patent protection to identify every patent that claims the drug or a use of the drug that could reasonably be asserted in an infringement action. 21 U.S.C. § 355(b)(1). The FDA lists the patents identified by the NDA applicant in a publication entitled Approved Drug Products With Therapeutic Equivalence Evaluations, which is universally referred to in the industry as the “Orange Book.” In the case of patents claiming methods of use, FDA regulations provide that only patents claiming “indications or other conditions of use” that either have been approved by the FDA or are in a pending NDA are to be submitted for listing in the Orange Book. 21 C.F.R. § 314.53(b).
When an applicant files an ANDA seeking FDA permission to market a generic drug, it is required to address each patent in the Orange Book that relates to that drug. Eli Lilly & Co., 557 F.3d at 1348. For method-of-use patents that will not expire prior to the proposed marketing of the generic drug, the ANDA applicant has two options.
First, the ANDA applicant can include a statement, known as a “section viii statement,” that the applicant is not seeking approval for the method of use that is claimed in the patent. 21 U.S.C. § 355(J)(2)(A)(viii). When submitting a section viii statement, the ANDA applicant must include a proposed label that removes or “carves out” the claimed method of use. See AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1046 (Fed.Cir.2010). The FDA will approve an ANDA with a section viii statement only if (1) there is no overlap between the proposed label submitted by the ANDA applicant and the use described in the Orange Book, and (2) removing the information about the claimed method of use from the label does not render the drug less safe or effective. See 21 C.F.R. § 314.127(a)(7); see also Applications for FDA Approval to Market a New Drug, 68 Fed. Reg. 36,676, 36,682 (June 18, 2003) (“A section viii statement would not be appropriate [when] the ANDA applicant is seeking approval for exactly the same labeling as that in the NDA for which the patent was submitted.”).
*1319 Second, the ANDA applicant can file a “paragraph IV certification,” which states that the patent “is invalid or will not be infringed by the manufacture, use, or sale” of the generic drug. 21 U.S.C. § 355(j)(2)(A)(vn)(IV); see Novo Nordisk A/S v. Carneo Pharmaceutical Laboratories, Ltd., 601 F.3d 1359, 1361 (Fed.Cir. 2010). If the ANDA applicant files a paragraph IV certification, it must also send a notice letter so advising the holder of the original NDA and the patent owner. 21 U.S.C. § 355(j)(2)(B).
For method-of-use patents, the “artificial” infringement claim provided by section 271(e)(2)(A) lies only against a patented use that has been approved by the FDA. Warner-Lambert, 316 F.3d at 1356. As this court explained in the Warner-Lambert case, “because an ANDA may not seek approval for an unapproved or off-label use of a drug under 21 U.S.C. § 355(j)(2)(A)(i), it necessarily follows that 35 U.S.C. § 271(e)(2)(A) does not apply to a use patent claiming only such a use.” Id.; see also AstraZeneca Pharm. LP v. Apotex Corp., 669 F.3d 1370,1377-78 (Fed. Cir.2012); Allergan, Inc. v. Alcon Labs., Inc., 324 F.3d 1322, 1334 (Fed.Cir.2003).
II
Bayer produces and markets Yasmin, an oral contraceptive. In 2001, the FDA approved the new drug application for Yasmin that was filed by Bayer’s predecessor, Berlex Laboratories, Inc. That application sought FDA approval for the use of Yasmin “for oral contraception.” The FDA approved the application, noting that it had “concluded that adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the agreed upon enclosed labeling text.”
The defendants in the two cases before us have all filed ANDAs with the FDA to market generic versions of Yasmin. The ANDAs, which track the original NDA as required, seek FDA approval for the use of the generic versions of Yasmin for oral contraception. In their respective ANDAs, the defendants have certified that the three patents that Bayer had listed in the Orange Book in connection with Yasmin are either invalid or would not be infringed by the manufacture, use, or sale of their generic version of Yasmin. See 21 U.S.C. § 355(j) (2) (A) (vii) (IV). In March 2008, Watson and Sandoz sent notice letters to Bayer regarding their ANDA filings. In response, Bayer filed a complaint against Watson and Sandoz in April 2008, alleging infringement under section 271(e)(2)(A) of one of the three listed patents, U.S. Patent No. 5,569,652 (“the '652 patent”). Lupin sent Bayer a notice letter in June 2010 regarding its ANDA filing. Bayer filed a complaint against Lupin in July 2010 alleging infringement of the same patent.
The '652 patent is a method-of-use patent with two independent claims:
I. A method of simultaneously achieving, during premenopause or menopause a gestagenic effect, antiandrogenic effect, and an antialdosterone effect in a female patient in need thereof comprising administering an amount of dihydrospirorenone to said female patient, wherein said amount of dihydrospirorenone is effective to simultaneously achieve a gestagenic effect, antiandrogenic effect and antialdosterone effect in said patient.
II. A method of simultaneously achieving, during premenopause or menopause, a contraceptive effect, an anti-androgenic effect, and an antialdosterone effect in a female patient in need thereof comprising administering an effective amount of dihydrospirorenone and an effective amount of an estrogenic compound, wherein said effective *1320 amount of dihydrospirorenone is effective to simultaneously achieve a gestagenic effect, anti-androgenic effect, and an anti-aldosterone effect in said female patient.
Those claims recite that the claimed method achieves three effects simultaneously: a contraceptive (or gestagenic) effect, an anti-androgenic effect (which reduces the activity of male hormones and can be effective in treating conditions such as hirsutism or acne), and an anti-aldosterone effect (also known as an anti-mineralocorticoid effect, which can be effective in reducing excess water retention in the body).
Watson and Sandoz moved for judgment of noninfringement on the pleadings under Federal Rule of Civil Procedure 12(c). They argued that their ANDAs related to the use of the generic form of Yasmin only for oral contraception and not for the combination of uses claimed in the '652 patent. Accordingly, they argued, they could not be held liable for inducing infringement of that patent. The district court granted their motions. The court held that because the FDA had not given approval for the use of the drug that was claimed in the '652 patent, Bayer could not state a claim for patent infringement. Bayer Schera Pharma AG v. Sandoz, Inc., 741 F.Supp.2d 541 (S.D.N.Y.2010). The court explained that an action for infringement of a method-of-use patent could be brought under section 271(e)(2)(A) only if the FDA had approved the use claimed in the patent under the patent-holder’s NDA. The court noted that the FDA had approved the use of Yasmin only for oral contraception, and not for the simultaneous treatment of three conditions, which was the use claimed in the '652 patent. Because the court concluded that there was nothing in the record to indicate that the defendants sought to promote their generic versions of Yasmin based on the anti-androgenic or anti-aldosterone properties claimed in the '652 patent, the court rejected Bayer’s claim that the defendants were liable for inducement of infringement under 35 U.S.C. § 271(b). The court therefore granted the motion and entered judgment of noninfringement in favor of Watson and Sandoz. Based on that ruling, Bayer and Lupin stipulated to, and the court entered, final judgment in Bayer’s suit against Lu-pin as well. Bayer Schering Pharma AG v. Lupin Ltd., No. l:10-cv-05423 (S.D.N.Y. Dec. 8, 2010). Bayer took appeals from both judgments, and we consolidated the two cases for appeal.
Ill
As the district court correctly noted, the issue in these cases is a very narrow one. The following propositions are not in dispute: First, Bayer does not enjoy patent protection for the drug Yasmin or for the use of the drug for contraception alone. See Bayer Schering Pharma AG v. Barr Labs., Inc., 575 F.3d 1341 (Fed.Cir.2009). Second, the '652 patent claims a method of use consisting of simultaneously achieving an anti-androgenic effect, an anti-aldosterone effect, and a contraceptive effect in a premenopausal or menopausal female patient in need of all three effects. Third, the only proposed “indication for use” in the NDA application filed by Bayer’s predecessor was for oral contraception, and the only use set forth in the “Indications and Usage” section of the label attached to the FDA’s approval letter was “for the prevention of pregnancy in women who elect to use an oral contraceptive.” Fourth, the Indications and Usage section of the defendants’ ANDAs used the same language and did not refer to the other effects claimed in the '652 patent. And finally, the parties agree that under 35 U.S.C. § 271(e)(2)(A), the '652 patent can be infringed only if the defendants’ *1321 ANDAs seek FDA approval to market Yasmin for the three simultaneous effects covered by the '652 patent.
In light of those uncontested propositions, Bayer’s quarrel with the district court is limited to contending that the FDA did approve the use of Yasmin to obtain all three effects simultaneously in menopausal and premenopausal patients in need of all three effects, and that the defendants’ ANDAs seek FDA approval for the same uses. Bayer contends that its label for Yasmin demonstrates that the FDA approved the use of the drug for all three effects, and that the similar label to be used by the defendants on their generic version of Yasmin likewise covers the use of the drug to obtain all three effects simultaneously in patients needing that combined treatment. Therefore, according to Bayer, the defendants are liable for inducing infringement by physicians and patients because the label instructs the use of the generic drug to obtain the three effects claimed in the '652 patent. The district court rejected Bayer’s argument, and so do we.
A
This court’s 2003 decision in Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348 (Fed.Cir.2003), sets the framework for analyzing this case. In Warner-Lambert, the patentee received approval from the FDA to market a particular drug for use in treating epilepsy. Warner-Lambert’s patent for use of the drug in treating epilepsy had expired, but Warner-Lambert had an unexpired patent claiming the use of the drug for treating neurodegenerative disease. That latter use of the drug, however, had not been approved by the FDA. Apotex, a generic manufacturer, filed an ANDA seeking approval to market a generic form of the drug for the approved use of treating epilepsy. Warner-Lambert sued under its unexpired patent, but this court held that it is “not an act of infringement [under section 271(e)(2)(A) ] to submit an ANDA for approval to market a drug for a use when neither the drug nor that use is covered by an existing patent, and the patent at issue is for a use not approved” by the FDA. Id. at 1354-55.
A second case from this court, decided the same year, is even more closely on point. In that case, Allergan, Inc. v. Alcon Laboratories, Inc., 324 F.3d 1322 (Fed.Cir.2003), Alcon, a generic drug manufacturer, filed an ANDA seeking approval to market the unpatented drug brimonidine for the FDA-approved use of reducing intraocular pressure. Allergan had two patents that claimed other uses for which brimonidine was effective: protection of the optic nerve and neural protection. Those uses, however, were not approved by the FDA. This court held that because those additional uses were not approved by the FDA, the generic drug applicant could not be liable for infringement under section 271(e)(2)(A), even though brimonidine necessarily had those protective effects in patients who took the drug for the approved purpose. Id. at 1324.
Based on Warner-Lambert and Allergan, the defendants’ conduct would constitute infringement under section 271(e)(2)(A) (or inducement of infringement under section 271(b)) only if the defendants’ ANDAs sought approval for the use protected by the '652 patent, i.e., for the combination of a gestagenic effect, an anti-androgenic effect, and an anti-aldosterone effect in patients needing that combination of effects. Because the defendants’ ANDAs are substantively identical to Bayer’s NDA, the use or uses for which the ANDAs seek FDA approval are necessarily the same as the uses for which the FDA has given its approval by granting *1322 Bayer’s NDA. The question to be answered, then, is whether the FDA has approved the use of Yasmin to achieve the combination of the three effects claimed in the '652 patent.
B
The FDA-approved label for an approved drug indicates whether the FDA has approved a particular method of use for that drug. An NDA that seeks FDA approval for a particular use for a drug must include “full reports of investigations” demonstrating that the drug is safe and effective for that use, 21 U.S.C. § 355(b)(1)(A), and it must include “the labeling proposed to be used for such drug ...,” id. § 355(b)(1)(F). The FDA determines whether the information submitted with the application shows that the drug is safe and effective for the use described in the submitted label. See id. § 355(d) (FDA approval requires showing that “drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof’ and that there is “substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof’); see also Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3922, 3934 (2006) (“The centerpiece of risk management for prescription drugs generally is the labeling which reflects thorough FDA review of the pertinent scientific evidence and communicates to health care practitioners the agency’s formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively.”).
The label for Yasmin that was approved by the FDA states in the Indications and Usage section that “Yasmin is indicated for the prevention of pregnancy in women who elect to use an oral contraceptive.” As noted, that characterization tracks the FDA’s approval letter for Yasmin, which stated that the NDA “provides for the use of Yasmin ... for oral contraception.”
In claiming that the label recognizes FDA approval of all three effects claimed in the '652 patent, Bayer relies on the “Pharmacodynamics” subsection of the “Clinical Pharmacology” section of the label, which recites that drospirenone, one of the two active compounds in Yasmin,
is a spironolactone analogue with antimineralocorticoid activity. Preclinical studies in animals and in vitro have shown that drospirenone has no androgenic, estrogenic, glucocorticoid, and antiglucocorticoid activity. Preclinical studies in animals have also shown that drospirenone has anti-androgenic activity.
While that passage states that Yasmin exhibits anti-mineralocorticoid activity and has the potential for anti-androgenic activity based on animal studies, neither that passage nor anything else on the label provides any safety or efficacy information associated with the possible use of Yasmin in treating patients who are in need of those effects. Thus, while the label mentions potential anti-mineralocorticoid and anti-androgenic activity, it does not do so in any way that recommends or suggests to physicians that the drug is safe and effective for administration to patients for the purposes of inducing these effects.
The FDA labeling regulation, 21 C.F.R. § 201.57, makes clear that the FDA has not approved the use of Yasmin to produce the pharmacological effects that are listed in the Clinical Pharmacology section of the label. The portion of the regulation that is addressed to the Indications and Usage section of the label requires the indications set forth in that section to be supported by *1323 “substantial evidence of effectiveness based on adequate and well-controlled studies.” Id. § 201.57(c)(2)(iv). The regulation adds that indications or uses “must not be implied or suggested in other sections of the labeling if not included in this section.” Id. The reference in the Clinical Pharmacology section of the label to the anti-mineralocorticoid and anti-androgenic activity of drospirenone is certainly not a direct indication of an appropriate use for Yasmin, and even if it could be considered an “implied or suggested” indication of an appropriate use, the regulation expressly states that such implied or suggested uses do not constitute approved uses.
In addition, the FDA regulation requires the label to provide a summary of the essential scientific information needed for the safe and effective use of the drug. See 21 C.F.R. § 201.56(a)(1). The Yasmin label does not provide physicians with such a summary with respect to the drug’s anti-androgenic and anti-mineralocorticoid effects, which is a further indication that the FDA did not approve the use of Yasmin to exploit those effects in treating patients.
Bayer points out that the sections of the regulation directed to the Indications and Usage portion of the label address only “the portion of the labeling that can detail the diseases or conditions the FDA has approved the drug to treat,” and that other effects “that do not treat a disease or condition ... will not be in the Indications section and will still be FDA approved.” However, whether other effects may be described outside the Indications and Usage section of the FDA-approved label does not address the issue in this case. The regulation states that the Clinical Pharmacology section of the label must include “a description of any biochemical or physiologic pharmacologic effects of the drug or active metabolites related to the drug’s clinical effect in preventing, diagnosing, mitigating, curing, or treating disease, or those related to adverse effects or toxicity.” 21 C.F.R. § 201.57(c)(13)(i)(B). That section of the label is also required to describe the clinically significant pharmacokinetics of a drug or its active metabolites; information related to in vitro and animal studies is permitted to be included in that section of the label only if the information is “essential to understand dosing or drug interaction information presented in other sections of the labeling.” Id. § 201.57(c)(13)(i). Thus, the fact that certain of the effects of a drug are described in the Clinical Pharmacology section of the label does not mean that the FDA has approved the use of the drug to produce those effects; it only ensures that physicians are aware of the full range of the drug’s pharmacological effects (especially those that might be considered adverse effects) when prescribing the drug for a purpose set forth in the Indications and Usage section and under the conditions described in other parts of the label.
Bayer notes that FDA-approved methods of use do not invariably appear in the Indications and Usage section of the label. For example, an FDA-approved method of use relating to the dosage or method of administration of a drug would appear not in the Indications and Usage section, but in the “Dosage and Administration” section of the label. But that does not help Bayer in this case. The '652 patent is narrowly focused on simultaneously achieving three effects in premenopausal or menopausal patients in need of all three effects; as the parties stipulated, the claim limitation referring to a “patient in need thereof’ means a patient with a “perceived need for” all three effects. The patent does not claim a method of achieving a contraceptive effect in a patient in need of contraception in which the drug used to achieve the contraceptive effect has two generally beneficial additional effects. To *1324 practice the method claimed in the '652 patent, a physician must determine that all three effects are needed by a specific premenopausal or menopausal patient. FDA approval of that method of use would require a showing that Yasmin was safe and effective for simultaneously obtaining those three effects in patients needing those effects. Acknowledgement of the safety and efficacy of that specific method of use would be evidenced by including it in the Indications and Usage section of the label. Therefore, the point is not simply that the method of use was not described in the Indications and Usage section that shows lack of FDA approval; the point is that the label, taken in its entirety, fails to recommend or suggest to a physician that Yasmin is safe and effective for inducing the claimed combination of effects in patients in need thereof.
IV
Bayer relies on four pieces of evidence to support its argument that the references to anti-mineraloeorticoid and anti-androgenic activity in the Clinical Pharmacology section of the Yasmin label indicate that the FDA has approved the use of Yasmin to induce those effects: (1) the FDA regulation that addresses the listing of patents in the Orange Book; (2) a declaration from Dr. Lee Shulman, a physician; (3) a declaration from Dr. Susan Allen, a former FDA official; and (4) marketing materials for Yasmin that were approved by the FDA. That evidence, however, demonstrates only that the FDA was aware that Yasmin could cause the effects discussed in the '652 patent. It does not go to the critical question of whether the FDA has found Yasmin to be safe and effective for the purpose of inducing those effects in a premenopausal or menopausal patient with a specific need for those effects. Absent that finding of safety and efficacy, and the recognition of such safety and efficacy on the Yasmin label, the Yasmin label cannot instruct (and the ANDA proposed label cannot induce infringement of) the method of use claimed in the '652 patent.
A
Bayer first relies on the FDA regulation that addresses the requirement to submit patents for inclusion in the Orange Book, 21 C.F.R. § 314.53. Bayer argues that the regulation supports its contention that the FDA approved the pharmacological effects listed in the Clinical Pharmacology section of the Yasmin label because the regulation requires the submission not only of patents that claim “indications,” but also patents that claim “other conditions of use.” Id. § 314.53(b). In Bayer’s view, that requirement shows that the FDA considered that infringement under section 271(e)(2)(A) could extend to the type of pharmacological effects detailed in the Clinical Pharmacology section of the Yasmin label. Bayer further contends that the regulation constitutes an interpretation of section 271(e)(2)(A), and that it is entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
Bayer’s argument reflects a misinterpretation of section 314.53. The regulation implements the patent listing requirements of 21 U.S.C. § 355(b)(1), which requires a patent holder to submit those patents for listing in the Orange Book “with respect to which a claim of patent infringement could reasonably be asserted.... ” The fact that Bayer submitted the '652 patent for inclusion in the Orange Book is not helpful to its case, for several reasons. First, the FDA does not make a determination as to whether particular patents should be listed in the Orange *1325 Book; it simply lists those patents that are submitted by patent holders. Second, the category of claims as to which infringement could reasonably be asserted is plainly broader than the category of claims that are infringed. Section 355(b)(1) and its implementing regulations encourage broad disclosure and do not require NDA applicants to make an extrajudicial determination of actual infringement. Section 271(e)(2)(A) defines the filing of an ANDA as an act of infringement, but it does not alter the underlying patent infringement analysis, which requires in the case of a method-of-use patent that the accused infringer use the patented product for the use claimed in the patent. See Warner-Lambert, 316 F.3d at 1356. Nothing in the regulation provides any support for Bayer’s position in this case.
B
Dr. Shulman, an obstetrician-gynecologist with experience in the clinical use of contraceptives, stated in his declaration that prescribing Yasmin as an oral contraceptive with the intent to produce an antimineralocorticoid pharmacological effect and an anti-androgenic pharmacological effect “is clearly stated and on-label.” That opinion, however, is contrary to the contents of the FDA-approved label for Yas- • min. The language of the Clinical Pharmacology section of the label does not indicate that the FDA has determined that the drug is safe or effective in inducing those effects in patients with a specific need for those effects, as claimed in the patent. See Warner-Lambert, 316 F.3d at 1356.
As to Yasmin’s anti-mineralocorticoid effect, the label simply states that drospirenone is a spironolactone analogue “with anti-mineralocorticoid activity.” It does not describe the extent of—or summarize the scientific evidence for—that activity in humans. The Dosage and Administration section of the label specifically describes the use of the Yasmin “[t]o achieve maximum contraceptive effectiveness”; it contains no discussion of the dosage required to achieve a therapeutic level of anti-mineralocorticoid effect. Even if knowing that drospirenone is a spironolactone analogue were all the information a physician would need to induce a desired therapeutic effect, the label contains no information regarding the safety of the drug in a patient needing such an effect.[1]
Similarly, as to Yasmin’s anti-androgenic effect, the information in the Clinical Pharmacology section of the label indicates only that drospirenone has been shown to generate that activity in preclinical studies in animals. The FDA has not found the drug to be safe or effective in inducing an anti-androgenic effect in a human patient, and the label neither provides a statement to that effect nor summarizes any supporting research. Therefore, notwithstanding Dr. Shulman’s understanding to the contrary, any prescription of Yasmin to produce either an anti-mineralocorticoid or anti-androgenic effect has not been approved by the FDA and is therefore “off label.”
C
Dr. Allen, a former FDA official, stated that while she was at the FDA she oversaw the approval of the Yasmin NDA, including the preparation of final contents of the Yasmin label. Dr. Allen stated that the label indicates that the FDA approved Yasmin for a therapeutic effect (contracep *1326 tion) and for the two additional pharmacological effects (the anti-mineralocorticoid and anti-androgenic effects). Regarding the pharmacological effects, Dr. Allen stated that listing those effects in the Clinical Pharmacology section of the label indicated that those effects were confirmed in Yasmin and are “ ‘pertinent’ to human use of the drug.” However, just because those effects were confirmed and are “pertinent” to human use, and therefore important for a prescribing physician to be aware of, does not mean—as the dissent contends— that the drug is safe or effective for use in inducing those effects in a patient with a specific need for them. Moreover, Dr. Allen distinguished between the contraceptive effect of Yasmin and the other effects, stating that the FDA “approved” the “therapeutic effect (contraceptive)” and the “two additional pharmacological effects.” Importantly, Dr. Allen did not say that Yasmin was approved for achieving those two additional effects in patients with a therapeutic need for those effects. Therefore, Dr. Allen’s view of the effect of FDA approval does not draw into question the proposition that Yasmin was not approved for the purpose of inducing the three simultaneous effects recited in the '652 patent in premenopausal and menopausal patients.
D
Finally, Bayer argues that the FDA’s approval of certain promotional materials highlighting the anti-mineralocorticoid and anti-androgenic properties of Yasmin indicates that the FDA approved those pharmacological effects. The problem with that argument is that the description of those effects is, in almost all cases, qualified. In the case of the anti-mineralocorticoid effect, the description is accompanied by a warning regarding the potential for hyperkalemia in high-risk patients. In the case of the anti-androgenic effect, the materials note that this effect is “seen in preclinical studies.” The FDA’s regulations require such disclosure of “specific side effect[s] ... in [approved] labeling.” 21 C.F.R. § 202.1(e)(4). That treatment is in contrast to the “clinically proved benefits” of contraceptive efficacy and cycle control. The fact that Bayer was able to frame a required disclosure in a positive light without crossing the line into promoting such use does not mean that the FDA has approved a use not otherwise indicated in the approved label. See 21 C.F.R. § 202.1(e)(6)(i) (advertisement violates 21 U.S.C. § 352(n), among other reasons, if it “[c]ontains a representation or suggestion, not approved or permitted for use in the labeling, that a drug is ... useful in a broader range of conditions”).
As applied to this case, Warner-Lambert and Allergan make clear that the defendants do not infringe Bayer’s '652 patent under section 271(e)(2)(A) and that their sale of the generic form of Yasmin would not induce infringement of that patent. The defendants’ ANDAs seek approval to market the generic form of Yasmin solely for contraceptive use, and there is no valid patent on the use of the drug for that purpose alone. The FDA-approved label for Yasmin does not indicate to physicians that the specific use claimed in the '652 patent, i.e., producing contraceptive, anti-mineralocorticoid, and anti-androgenic effects in premenopausal and menopausal women with a specific need of all three effects, is safe and effective. Therefore, we agree with the district court that the FDA has not approved such use and that the defendants cannot be held liable for infringement of the patent.
AFFIRMED

. The dissent questions whether we are finding fault with the FDA procedures or the FDA-approved label. To the contrary, the lack of information on the label regarding dosage and administration to induce an antimineralocorticoid effect is completely appropriate for a drug that has not been found safe and effective for inducing that effect.